In the United States Court of Appeals
For the Fifth Circuit

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**
December 20, 2007

Charles R. Fulbruge III
Clerk

No. 05-70044

LUIS SALAZAR,

> Petitioner - Appellant,

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

> Respondent - Appellee,

Appeal from the United States District Court
for the Western District of Texas
No. 5:03-CV-00175

Before JOLLY, DAVIS, and OWEN, Circuit Judges.

PER CURIAM:[*]

Luis Salazar was convicted in Texas state court of capital murder and
sentenced to death. The district court denied Salazar's habeas petition under §
2254 on all grounds but granted Salazar a Certificate of Appealability (COA) on the
sole issue of whether Salazar's trial counsel rendered ineffective assistance by

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

failing to present available expert testimony controverting the medical examiner's trial testimony that the victim's body displayed a "classic" pattern of injuries consistent with attempted sexual assault. We AFFIRM the denial of habeas relief.

The Texas Court of Criminal Appeals summarized the evidence presented in the guilt/innocence trial as follows:

[i]n October of 1997, Martha Sanchez lived at 250 Future Street in San Antonio with her husband Oscar Ochoa, ten-year-old stepson Erick, two-year old daughter Brianna, and four-month old son Timothy. For some three years, [Salazar] lived next door to Sanchez and her family and was well-acquainted with them. In fact, Ochoa had helped [Salazar] obtain employment at the Super K-Mart where Ochoa himself worked.

The family's encounters with [Salazar], however, were not always positive. Ochoa testified that earlier in 1997 [Salazar] approached Sanchez in her home and asked if he could borrow some sugar, but "not that kind of sugar." Ochoa confronted [Salazar] and ordered him to stay away from the family's home. According to Ochoa's testimony, Sanchez thereafter became afraid of [Salazar]. Nicole Ponce, Sanchez's 19-year-old niece, also testified that she had served as a babysitting at the family's home and spent the night there on numerous occasions. On several of those occasions, she explained, [Salazar] would call late in the evening ask for Sanchez's company. According to Ponce, however, Sanchez refused to speak with [Salazar]. [Salazar] moved out of his house around September of 1997 and took up residence at 122 Ashland in San Antonio.

Sanchez last spoke to Ochoa in the early morning hours of October 11, 1997. As was his custom when working the "graveyard" shift, Ochoa called home from work at about 12:30 a.m.

Evidence adduced at trial indicated that, at some time after that phone call, [Salazar] entered Sanchez's home through the left front window, using an empty milk crate to climb into the home. A trail of muddy footprints led from the window inside the house. [Salazar] retrieved a knife from the kitchen and entered Sanchez's bedroom. As [Salazar] began stabbing Sanchez, a struggle ensued, leaving the bedroom in disarray. Stepson Erick testified that he awoke to Sanchez's scream: "Luis, why are you doing this?

2

Leave me alone!" Erick then entered the bedroom where he saw his stepmother struggle while [Salazar] was stabbing her. As Erick attempted to grab the knife, [Salazar] stabbed him in the chest. Sanchez instructed Erick to leave and call for help, and he did so, ultimately finding his way to the home of Sylvia Montenegro, who lived nearby. Montenegro testified that she answered her door to find Erick bleeding from his chest and begging frantically for help. He told her that someone had broken into the home and stabbed both him and Sanchez. Erick identified [Salazar] as the attacker.

Montenegro called 911 and sent her future son-in-law Adrian to the Sanchez home to investigate. Adrian removed the two youngest children, Brianna and Timothy, safely from the home. He testified that he then entered the home again and, after checking Sanchez's pulse, realized that she was dead. An EMS unit soon arrived, confirmed Sanchez's death and transported Erick to University Hospital. [Salazar] had fled the scene. Later, however, [Salazar] telephoned 911 to turn himself into police, who arrested him without incident at 9127 Port Victoria and informed him of his Miranda rights. Meanwhile, police approached Ochoa at work and informed him of his wife's death.

Physical evidence showed that Sanchez had suffered stab wounds to the heart, lungs, and aorta, causing her death. Moreover, the medical examiner testified that Sanchez's death was not immediate; it took several minutes for her to die. In addition, Sanchez suffered contusions and skin abrasions on the outer thigh, as well as contusions to the inner thigh. According to the medical examiner, although Sanchez suffered no genital injuries, no sperm was present, and her clothes had not been removed, this pattern of bruises and scratches indicated an attempted sexual assault. Evidence at the scene also indicated that the telephone lines outside the home had been cut and that the interior of the home was in shambles, although no fingerprints were found on the front windows. Investigators found a cordless phone under Sanchez's left arm and the bloody kitchen knife on a coffee table near Sanchez's bedroom.

[Salazar] testified at trial. Although he did not deny that his actions caused Sanchez's death, he offered his own version of the incident. He claimed that, on the evening of October 11, he and his brother went to a friend's home in San Antonio, where they smoked marijuana and snorted cocaine, and they drank beer and liquor. He left the home between 3:00 a.m. and 4:00 a.m., went to a local taco bar but was unable to find a ride home. He thus decided to go to his old home at 254 Future Street, which his mother-in-law still owned and at which he still kept some personal belongings. [Salazar] testified that although he intended to go to 254 Future,

3

he mistakenly approached Sanchez's home at 250 Future. And because he no longer had his key to the home at 254 Future, he decided to enter through the window. Once inside, he claimed (believing that he was in his own home) that he heard a frightening noise. [Salazar] then obtained a knife from the kitchen. He testified that he walked out of the kitchen, bumped into a person he could not see, became frightened, and began stabbing the unknown person. [Salazar] further stated that, during his stabbing frenzy, he felt a pain in his arm, realized that someone was behind him, and he began stabbing that person, as well. He then saw the person behind him and heard the victim say "Run!" or "run Erick!" According to [Salazar], he subsequently realized that he was in the wrong home and simply left the house.

[Salazar] testified that his state of mind during the incident was similar to a black-out. He stated that he did not remember Sanchez screaming "Luis, why are you doing this to me?" he did not remember Brianna crying and he did not remember Erick telling him to leave Sanchez alone. He also denied cutting the telephone lines at 250 Future and denied trying to rape Sanchez, although he offered no explanation for the bruises and abrasions on her legs. [Salazar] testified, however, that he felt good during acts of violence and that he had dreamed of killing people. The defense called no other witnesses and rested after [Salazar's] testimony.

Salazar was charged with a single count of capital murder committed during the course of committing or attempting to commit aggravated sexual assault and burglary.

At trial, Salazar's intent to commit a sexual assault on the night of the murder was an important issue. Among other evidence, the prosecution elicited testimony from the medical examiner that the pattern of contusions on the victim's body indicated an attempted sexual assault contemporaneous with her death. The medical examiner's opinion about the pattern of contusions on Martha Sanchez's body was not expressed in the autopsy report, and defense counsel attempted unsuccessfully to keep this testimony from the jury. Defense counsel also attempted to discredit the medical examiner's opinion on cross-examination, but

4

he did not consult with an independent pathologist or call any rebuttal witnesses to refute the medical examiner's testimony.

Although a number of lesser-included offenses were included in the jury charge, Salazar was convicted of capital murder as charged in the indictment and sentenced to death. He appealed directly to the Texas Court of Criminal Appeals, which affirmed the conviction and death sentence in an unpublished opinion.

Salazar filed an application for writ of habeas corpus with the state trial court, challenging his conviction and sentence on a number of grounds, including several complaints of ineffective assistance of counsel. Following an evidentiary hearing, the trial court issued extensive findings of fact and conclusions of law and recommended that the writ be denied. Among other things, the court concluded that Sanchez had not established either prong of the *Strickland v. Washington*[1] ineffective-assistance-of-counsel standard and thus had not been denied effective assistance of counsel. The Court of Criminal Appeals denied habeas relief in a short, unpublished opinion. In denying relief, the court adopted the trial court's findings and conclusions, but also conducted its own review of the record.

Salazar subsequently sought habeas relief in federal court under 28 U.S.C. § 2254, reasserting his ineffective assistance claims along with a host of other claims. In a lengthy and detailed opinion, the district court denied relief on all the claims. The court concluded, in pertinent part, that Salazar had not established his ineffective-assistance claim under *Strickland*'s two-part test.[2] The district court denied Salazar a COA on all claims except

---

[1] 466 U.S. 668, 687 (1984).

[2] Salazar v. Dretke, 393 F. Supp. 2d 451, 497-501 (W.D. Tex. 2005).

Salazar's claim that trial counsel was ineffective because he failed to provide rebuttal expert testimony regarding the bruise pattern on Martha Sanchez's body.[3]

On appeal, Salazar primarily confines his argument to the scope of the COA but also argues that trial counsel was ineffective for failing to investigate and present evidence rebutting the prosecution's evidence that phone lines at the Sanchez residence were cut or disabled shortly before the murder. We will not consider the latter argument because it exceeds the scope of the COA and Salazar has not requested an expanded COA.[4]

## II

Salazar is not entitled to federal habeas relief on his ineffective-assistance-of-counsel claim unless the state court's adjudication of his claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[5]

The state court's factual determinations "shall be presumed to be correct," and Salazar has "the burden of rebutting that presumption of correctness by clear and convincing evidence."[6]

To prevail on a Sixth Amendment ineffective-assistance-of-counsel claim, Salazar must establish that: (1) counsel rendered deficient performance and (2) counsel's actions resulted in

---

[3] Id. at 508.

[4] See United States v. Kimler, 150 F.3d 429, 430-31 (5th Cir. 1998); Lackey v. Johnson, 116 F.3d 149, 151-52 (5th Cir. 1997).

[5] 28 U.S.C. § 2254(d) (governing federal habeas corpus relief for individuals in state custody).

[6] Id. § 2254(e)(1); Morrow v. Dretke, 367 F.3d 309, 315 (5th Cir.), cert. denied, 543 U.S. 960 (2004).

actual prejudice.[7] Both prongs must be established to prevail on an ineffective-assistance-of-counsel claim.[8] The state habeas court's conclusion that counsel rendered effective assistance is not a fact finding binding on this court.[9] Instead, both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.[10]

To demonstrate deficient performance, Salazar must show that "counsel's representation fell below an objective standard of reasonableness" considering all the circumstances.[11] There is a "strong presumption" that counsel's representation "falls within the wide range of reasonable professional assistance."[12]

To establish prejudice, Salazar must show that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable."[13] This requires Salazar to establish a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt.[14] A "reasonable probability" is one "sufficient to undermine confidence in the outcome."[15] "It is not enough for the defendant to show that the errors had

---

[7]Strickland, 466 U.S. at 687.

[8]Id.

[9]Id. at 697.

[10]Id.

[11]Id. at 689.

[12]Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

[13] Id. at 687.

[14] Id. at 695.

[15] Id.

7

some conceivable effect on the outcome of the proceeding."[16]

Salazar contends that his trial attorney's failure to confer with an independent forensic pathologist before or during trial was outside the range of competent assistance. Salazar argues that, if his attorney had consulted with a forensic pathologist, he would have discovered that the bruises and abrasions on Martha Sanchez's body were too remote in time to have been caused by a struggle immediately before her death. At the evidentiary hearing on Salazar's state habeas application, a forensic pathologist, Dr. Radelat, testified on Salazar's behalf. Dr. Radelat concluded that the bruise pattern on Martha Sanchez's body did not indicate an attempted sexual assault. Salazar argues that this evidence would have rebutted the medical examiner's testimony that the bruising on Martha Sanchez's body indicated an attempted sexual assault. Because there was no evidence that Martha Sanchez had been sexually assaulted and no evidence of any attempt to remove her clothing, Salazar contends that he was prejudiced by his counsel's failure to investigate and retain a forensic pathologist for the purpose of producing testimony of this nature.

Salazar's trial counsel testified in the state habeas proceeding that he did not intentionally ignore the bruise pattern. Instead, he was surprised by the medical examiner's testimony at trial because there was no mention of the medical examiner's conclusions regarding the bruise pattern in the autopsy report and there was no other evidence of a sexual assault or an attempted sexual assault. Counsel noted that he vigorously cross-examined the medical examiner regarding the bases for her opinion. The only explanation counsel offered

---

[16] Id. at 693.

8

for failing to consult a forensic pathologist after the medical examiner testified was that the capital charge included the alternative burglary predicate. Salazar's trial counsel agreed that he could have requested a continuance but said it was unlikely the court would have granted the request.

Even if counsel's performance was deficient, which we need not decide, Salazar has not established he was prejudiced. To determine whether Salazar was prejudiced, we have reviewed the other evidence presented in the case to determine what effect Dr. Radelat's testimony could have had on the entire evidentiary picture.[17]

At trial, Salazar admitted stabbing Martha Sanchez to death after entering her house without consent. He further testified that he found her attractive, he desired to have intercourse with her, and he had recently propositioned her. Salazar also admitted that he told his wife before the murder that violence made him feel good and that he had dreams about killing people.

The prosecution also presented evidence that Martha Sanchez was afraid of Salazar and that Salazar had committed a prior sexual assault on an acquaintance, although he pleaded guilty to a lesser charge. There was evidence that the telephone lines had been cut before Salazar went into the house. Salazar's muddy footprints led directly from the point of entry to the kitchen where he obtained two knives, which were the murder weapons. He then went to Martha Sanchez's bedroom. The only signs of struggle were in Martha Sanchez's bedroom and her blood was found only in her bedroom. Martha Sanchez's body was found on the floor of

---

[17] See Johnson v. Scott, 68 F.3d 106, 109 (5th Cir. 1995).

9

her bedroom on top of some of her bedding. There was no reason for Salazar to be in Martha Sanchez's house, other than his claim that he entered by mistake.

The medical examiner testified that the bruise pattern on Martha Sanchez's legs was consistent with a person wrapping his hands around her knees and legs in a forcible attempt to separate her legs. The medical examiner concluded, based on her experience with known rape victims, that the bruise pattern indicated an attempted sexual assault. She gave specific testimony regarding the age, size and placement of the bruises and abrasions on Martha Sanchez's body and explained why those factors supported her conclusion. She also testified that the bruise pattern on Martha Sanchez's legs, the mud on Martha Sanchez's inner thigh, and the fingernail abrasions on her thighs was inconsistent with Salazar's version of events. The medical examiner gave specific, cogent reasons for her conclusion that the bruise pattern indicated an attempted sexual assault. She pointed to ten different contusions and a "scratch abrasion" which formed this pattern. She placed particular importance on four contusions on the inside of her knee and thigh.

In comparison, Dr. Radelat's opinion that the bruise pattern did not indicate an attempted sexual assault was conclusory. He gave no explanation for his conclusion other than the apparent age of one large abrasion on Martha Sanchez's thigh, which he said appeared to predate the murder. Dr. Radelat did not explain, however, how the age of this abrasion related to the estimated time of death or to the medical examiner's opinion that the overall pattern of contusions indicated an attempted sexual assault. Dr. Radelat did not contradict any of the medical examiner's findings regarding the location, appearance, or freshness of any of the other

10

scratches, bruises, and abrasions on Martha Sanchez's body other than to say that they were of "various ages." Moreover, Dr. Radelat admitted that the medical examiner may have been in a better position to judge the age of the bruises than he was because he had only reviewed autopsy photographs. Finally, Dr. Radelat did not offer an alternative explanation as to how the bruising and abrasions may have occurred and did not explain whether they were consistent with Salazar's version of events. Thus, even if Dr. Radelat had testified at Salazar's trial, there would still be no disagreement between the experts regarding the existence and location of the bruises and abrasions on Martha Sanchez's body and no alternative explanation for the existence of those bruises and abrasions. In fact, Dr. Radelat's major specific disagreement with the medical examiner boiled down to whether one of the ten bruises predated the night of the murder. In light of all the evidence presented at trial, there is not a reasonable probability that Dr. Radelat's testimony would have given jurors a reasonable doubt regarding Salazar's guilt.

Even if Dr. Radelat's testimony could have raised a reasonable doubt regarding the attempted sexual assault predicate, the capital murder conviction would likely have been sustained on the attempted burglary predicate. The Texas Court of Criminal Appeals held that there was legally and factually sufficient evidence to support Salazar's conviction on the burglary predicate, which Salazar does not challenge.[18] In fact, he does not even address the

_____

[18] In rejecting Salazar's claim that the state failed to prove the required mens rea for burglary, the Texas Court of Criminal appeals stated:

> [t]o prove the underlying burglary, the State was required to show that [Salazar] either (1) entered Sanchez's home with intent to commit a felony, theft, or assault, or (2) entered Sanchez's home and committed or attempted to commit a felony theft or assault. Although [Salazar] attempted to negate the mental element of the offense by claiming that he entered the home mistakenly

11

effect of the burglary predicate. This is understandable in light of Salazar's admission that he stabbed and killed Martha Sanchez and stabbed her 10-year-old stepson. As the Court of Criminal Appeals observed, the jury rejected Salazar's mistaken entry into the Sanchez home version of the incident. Evidence of his attacks on Martha and her stepson was therefore uncontradicted and we find it highly unlikely the jury would have rejected the state's evidence that Salazar intentionally attacked Martha and Erick and thereby committed burglary in the Sanchez home.[19] Exclusion of the forensic pathologist's testimony regarding the attempted sexual assault does not undermine in any way the overwhelming evidence of Salazar's guilt with respect to the burglary predicate.[20] Therefore, even if defense counsel's performance were deficient, which we need not decide, there was no prejudice, and there is no basis for granting federal habeas relief.

The district court's judgment denying Salazar's federal habeas petition is AFFIRMED.

---

and stabbed the victim while fearing for his own safety, the jury as trier of fact, could have disbelieved his testimony. The jury clearly did reject [Salazar's] version of the incident, and accepted the State's contention that [Salazar's] nonconsensual night entry into the home, the cut telephone line, [Salazar's] deliberate retrieval of a kitchen knife, and his repeated stabbing of Sanchez established an intent to commit, or commission of, a felony.

TEX. PENAL CODE § 30.02(a)(1), (3).

[19] Salazar v. Dretke, 393 F. Supp. 2d 451, 500 (W.D. Tex. 2005).

[20] See Green v. Lynaugh, 868 F.2d 176, 177 (5th Cir. 1989) ("If the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fail."). Our review of the record does not support counsel's argument that the centerpiece of the state's theory was that Salazar's commission of sexual assault served as the predicate for the capital murder charge. In the state's closing argument, the prosecutor relied on burglary at least as much as sexual assault.

12